UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**DENNIS E. JONES-EL**
*now known as Mustafa-El K.A. Ajala*,

   Plaintiff,

  v.           Case No. 23-C-1138

**MARY MOORE et al.**,

   Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

  Plaintiff Mustafa-El K.A. Ajala (formerly known as Dennis Jones-El), was an inmate at Waupun Correctional Institution from July 15, 2020, through October 26, 2021. He is represented by Attorney Jarrett Adams and is proceeding on Eighth Amendment claims based on allegations that Defendants were deliberately indifferent to his biceps injury. On August 15, 2025, Defendants moved for summary judgment. For the reasons explained below, the Court will grant the motion and dismiss this case.

### BACKGROUND

  During the relevant time, Ajala was incarcerated at Waupun Correctional Institution, where Defendant Robert Weinman worked as the Health Services Unit Manager, Defendant Dr. Cheryl Jeanpierre worked as a physician, and Defendant Mary Moore worked as an advanced practice nurse prescriber. Also during this time, Defendant Paula Stelsel was employed by the Wisconsin Department of Corrections (DOC) as the health services nursing coordinator at the DOC's central offices in Madison. Dkt. No. 56 at ¶¶1-11.

On August 21, 2020, Ajala was involved in a fight with another inmate. A nurse (who is not a Defendant) noted in his medical chart that he refused an assessment after the fight and denied any injury. On August 24, 2020, the health services unit received a health services request from Ajala, stating that he believed his right biceps and forearm were bleeding internally and that he had torn his right biceps muscle. A nurse (who is not a Defendant) examined Ajala and noted bruising around his elbow and triceps area. He also noted that Ajala had minimal pain when he was not flexing. The nurse advised Ajala to rest and informed him he would have a provider follow up with him. The nurse should have instructed the scheduler to place Ajala on his provider's schedule, but Moore explains that a review of Ajala's records show that the nurse never referred Ajala to a provider, so no appointment was scheduled. Dkt. No. 56 at ¶¶27-33.

A few days later, on August 26, 2020, Ajala submitted another request complaining about pain and asking when he would be seen. A nurse (who is not a Defendant) reviewed the request two days later, on August 28, 2020, and entered a referral for Ajala to see a provider. Ajala submitted another request asking for medication and was informed by an unknown person (who is not a Defendant) that he could not have "keep-on-person" medication in the restricted housing unit. Dkt. No. 56 at ¶¶34-38.

On September 1, 2020, a nurse contacted Moore and informed her that Ajala was requesting surgery for a tendon tear in his right arm. She noted that he had a referral to see a provider and was upset that he had not yet been seen. The nurse asked Moore what recommendations she had for Ajala until he could be seen. Moore responded that she did not have any recommendations prior to him being examined because she could not recommend anything more than what nursing staff could provide him (ice and ibuprofen). Over the next few days, Ajala sent several more requests explaining that he was in extreme pain, the naproxen was not working, and he needed to be seen by a specialist or sent to a hospital. Ajala directed his requests to Moore,

and nurses responded that his requests would be referred to Moore and confirmed that an appointment with a provider had been scheduled. Dkt. No. 56 at ¶¶39-45.

On September 9, 2020, Dr. Jeanpierre saw Ajala for complaints about a possible torn right biceps tendon. Dr. Jeanpierre noted that, although Ajala had a deformity in his biceps, his hand grasps were equal—meaning there was no significant muscle weakness—and circulation, motion, and sensation checks were normal. Dr. Jeanpierre ordered meloxicam and a topical muscle rub for the pain and submitted an offsite service request for an MRI of Ajala's biceps. Dr. Jeanpierre explains that she did not mark the MRI as urgent because of the ongoing COVID-19 pandemic and because she knew that offsite providers were inundated with patients and were prioritizing patients with more urgent conditions. Once Dr. Jeanpierre placed the order for an offsite appointment, the scheduling became the responsibility of a licensed practitioner nurse (LPN). The offsite appointments are scheduled according to the offsite provider's availability along with the institution's transportation availability. LPNs do not have control over the calendar of offsite providers; the offsite providers give the LPNs available appointments, and LPNs take what they are given. Dr. Jeanpierre had no further involvement in Ajala's care after this appointment. Dkt. No. 56 at ¶¶46-59, 147.

Whenever a prisoner has an offsite appointment, the provider is required to sign an offsite service request on the day of the appointment to confirm the outpatient contact date and time as well as to communicate additional data to the offsite provider. On the day of Ajala's MRI, Dr. Jeanpierre must not have been working because Moore signed the form sent with Ajala to the MRI. Someone crossed out "MRI right biceps" and replaced it with "right shoulder w/o," indicating that Ajala was to receive an MRI without contrast of his right shoulder. Moore asserts that she did not alter the form or write "right shoulder w/o," as the change is not written in her handwriting. Dr. Jeanpierre also confirms that she did not cross out "MRI right biceps" or write "right shoulder

3

w/o." Neither Moore nor Dr. Jeanpierre know who changed the order or why the order was changed. On December 23, 2020, Ajala received an MRI of his right shoulder, which showed a rupture of his right biceps tendon and full thickness tear involving his rotator cuff. Dkt. No. 56 at ¶¶60-70.

A few days after the MRI, on December 27, 2020, the health services unit received a request from Ajala, in which he stated that the MRI had been of his rotator cuff, not his biceps. Moore responded that "[s]houlder MRI's do show some biceps tendon as well. The MRI order specifically said to look at the biceps tendon." At an appointment a few days later, Moore informed Ajala that the MRI showed a complete tear of the rotator cuff. Ajala again highlighted that the MRI was supposed to be of his biceps tendon. Moore examined Ajala and noted an obvious deformity in his biceps area. She also noted that he had normal strength in his right arm. Moore ordered a physical therapy consult for the biceps deformity and an orthopedic consult for the rotator cuff. Moore explains that physical therapy could have helped Ajala regain any loss of function from the torn biceps muscle. Dkt. No. 56 at ¶¶71-79.

On April 5, 2021, Ajala went offsite to Waupun Memorial Hospital for additional diagnostic testing of his biceps, but he returned without the imaging being completed because there was a discrepancy between the order and the site that needed to be imaged. Ajala reported that his biceps was to be imaged, but the paperwork was for imaging of his rotator cuff. The hospital kept the order when it sent Ajala back to the prison, and Moore has no insight into why the order was incorrect. Dkt. No. 56 at ¶80.

That same day, Moore placed an order for Ajala to be seen via telemedicine to go over the December MRI results for his biceps and rotator cuff pain. Ajala was seen via telemedicine by Dr. Eric Nelson about a week later, on April 13, 2021. Dr. Nelson noted that the appointment had been scheduled for an examination of Ajala's shoulder, but he was actually complaining about an

elbow injury. Dr. Nelson noted a deformity of Ajala's biceps muscle belly consistent with a distal biceps tendon rupture. Ajala explained that his rotator cuff tear predated his biceps injury. Dr. Nelson noted that the MRI showed that the rotator cuff was torn, and that the biceps tendon was attached to the shoulder. He also noted "an obvious popeye deformity of the right biceps consistent with a distal biceps rupture." The distal biceps attach to the radius bone in the forearm, close to the elbow. Dr. Nelson noted that Ajala's elbow had full range of motion. Ajala informed Dr. Nelson that his biceps issue was causing him more limitation than his rotator cuff. Dr. Nelson was unsure whether his biceps injury was repairable given the chronicity involved (meaning that the injury had been present for more than three months), and he recommended that Ajala be seen at the University of Wisconsin Orthopedics clinics. Dkt. No. 56 at ¶¶81-94.

On April 19, 2021, a week after his appointment with Dr. Nelson, Moore placed an order for Ajala to be seen offsite for a consultation on his rotator cuff tear and distal biceps tendon rupture. A few weeks later, on May 6, 2021, Ajala submitted a health services request stating that he was "still having problems w/ [his] arm (right biceps tendon/muscle rupture)." He further explained that "it's very painful, feels as if the muscle/tendon is continuing to recoil into my forearm." He asked that his appointment be expedited. Moore responded and notified Ajala that appointments at the University of Wisconsin clinic could not be expedited because the clinic triages all referrals for urgency. Moore highlights that institution staff cannot control when offsite specialists accept an appointment. Dkt. No. 56 at ¶¶95-100.

On August 6, 2021, a representative from the clinic called a nurse who informed Moore that there had been a change in the provider's scheduling template and that Ajala's scheduled consult was rescheduled to the next available appointment. Moore saw Ajala on October 25, 2021, for a follow up. She informed him that he had an appointment scheduled with the University of Wisconsin clinic, and she confirmed that he had a prescription for Naproxen as needed for the

5

pain. Moore explained that Ajala's prognosis was uncertain given the chronicity of his problem. Ajala responded that the chronicity was Waupun's fault. Dkt. No. 56 at ¶¶101-03.

On October 26, 2021, Ajala transferred to Jackson Correctional Institution and was no longer under Moore's care. On November 8, 2021, a nurse confirmed with Ajala that he had an offsite appointment at the University of Wisconsin clinic for his biceps. On January 3, 2022, his doctor at Jackson Correctional ordered that Ajala be seen at Gundersen Lutheran Medical Center for a consultation regarding his rotator cuff tear. Ajala was seen at Gunderson about a month later, on February 11, 2022. The doctor opined that Ajala would benefit from a rotator cuff repair as his "biggest issue is his shoulder," but he also noted that his "chronic retracted biceps tendon rupture . . . is really nonoperable unless we were to consider a large grafting procedure, which [he] would not recommend." The doctor noted that although Ajala could "expect to have some weakness and fatigue with supination and flexion," the doctor did "not think this is going to give him a significant disability." Ajala refused rotator cuff surgery because he did not trust the Jackson Correctional administration. Dkt. No. 56 at ¶¶104-21; Dkt. No. 51-1 at 153-54.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932,

937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Ajala asserts that Defendants were deliberately indifferent to his biceps injury when they delayed treating his biceps tendon rupture, which resulted in a permanent, non-operable injury. "[An] inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference. That is especially so if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020). Importantly, however, under §1983, government officials are liable only for their own misconduct. *See Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). This means that deliberate indifference can result *only* when the delay was in the control of the government official. *See Walker v. Benajamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (affirming summary judgment for a doctor because the delays between the initial visit, diagnosis, and visit to the specialist were not within his control).

Dr. Jeanpierre and Moore are entitled to summary judgment because Ajala has presented no evidence suggesting that either of them were deliberately indifferent to his biceps injury. As to Dr. Jeanpierre, the record shows that she examined him one time, a couple of weeks after he first requested medical treatment. Dr. Jeanpierre was not responsible for her schedule; she relied on nurses to triage prisoners' conditions and schedule them to see her as appropriate. Following her examination of Ajala's biceps, Dr. Jeanpierre ordered medication for his pain and submitted an offsite services request for an MRI to confirm her suspected diagnosis so that treatment options

7

could be evaluated. No jury could reasonably conclude that her response suggests that she was deliberately indifferent to Ajala's condition.

As to Moore, she first interacted with Ajala shortly after his MRI, at which time she explained the MRI results. After noting an obvious deformity in his biceps area, she ordered a physical therapy consult to help with any loss of function, although her examination revealed that Ajala had normal strength in that arm. She also ordered an orthopedic consultation for his shoulder condition. Ajala also was sent offsite for additional diagnostic imaging of his biceps, but once again there was a discrepancy between the order and the site that needed to be imaged, so that imaging did not happen. Rather than placing yet another order for an MRI, Moore ordered a consult with an orthopedic specialist to evaluate Ajala's shoulder and biceps pain. The specialist, who examined Ajala about a week later, was unsure if the biceps injury could be repaired, so he recommended a referral to a different specialist. Moore then placed an order for Ajala to see a second specialist. Months later, the second specialist notified Moore that Ajala's originally scheduled appointment would need to be rescheduled. During this time, Moore had entered a standing order for naproxen to address Ajala's pain. Ajala transferred to a different institution before his appointment with the second specialist, at which time his care was transferred to different providers.

Given Moore's attention to Ajala's condition, including promptly reviewing the MRI results, referring him to physical therapy, prescribing pain medication, and referring him to two different offsite specialists, no jury could reasonably conclude that she was deliberately indifferent to his injury. Indeed, Ajala does not appear to take issue with Dr. Jeanpierre or Moore's treatment decisions. Rather, he focuses on the significant delay between his initial visit with a nurse, the imaging, the diagnosis, and the visits to the specialists. But Ajala presents no evidence that Dr. Jeanpierre or Moore were responsible for these delays. Both Defendants explain that they have no

control over when offsite specialists accept a referral for an appointment—the specialists triage all referrals for urgency and the institution has no choice but to accept the appointment that is given.

Ajala notes that Dr. Jeanpierre or Moore could have marked their referrals as urgent, but he has presented no evidence from which a jury could reasonably conclude that no minimally competent professional would have responded as they did under similar circumstances. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (holding that a medical professional's treatment decisions will be afforded deference unless no minimally competent professional would have responded as such under the circumstances). Ajala exhibited no significant muscle weakness and had full range of motion, and his circulation, motion, and sensation checks were normal. Moreover, Dr. Jeanpierre explains that Ajala's injury occurred at the height of a global pandemic when offsite providers were inundated with patients and were prioritizing conditions more urgent than a biceps injury. Moore also explains that there was no option to expedite Ajala's appointment because the University of Wisconsin clinic triages all referrals it receives to determine urgency. Ajala, like all people with medical conditions, would have preferred immediate care, but delay is a common frustration faced by all people, incarcerated or not, which is precisely why the Constitution does not mandate immediate care. *See Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009).

In short, Ajala may have been the victim of delayed medical care that has left him with a permanent injury, but the evidence shows that "he is the victim not of any one human being's deliberate indifference but of a system of medical care that diffused responsibility for his care to the point that no single individual was responsible for seeing that he received the care he needed in a timely way. As a result, no one person can be held liable for any constitutional violation." *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 799 (7th Cir. 2014).

Finally, Ajala's claims against Weinman, the health services manager, and Stelsel, the nursing coordinator, must also be dismissed. Their involvement was limited to reviewing one health services request and two inmate complaint appeals. Both responded promptly after investigating Ajala's complaints about the treatment delay and confirmed that Ajala was receiving multiple medical interventions. They also explained that institution staff do not control offsite specialists' calendars. Given that neither Weinman nor Stelsel had the power to prescribe medication, second-guess or overrule a provider's treatment decisions, or force an offsite specialist to accept a referral on an expedited basis, no jury could reasonably conclude that they acted with deliberate indifference to Ajala's biceps injury. *See Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (prison health administrator who investigated prisoner's complaints by reviewing his medical records could defer to provider's decisions).

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 48) is **GRANTED**. This action is **DISMISSED**. The clerk of court is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 25th day of November, 2025.

_____
William C. Griesbach
United States District Judge